BARBARA J. MANN, ADMINISTRATRIX, ETC.

V.

THOMAS A. HINTON, INDIVIDUALLY, ETC., ET AL.

Record No. 940545

April 21, 1995

Present: All the Justices

*Bernard T. Holmes (Holmes & Edmonds,* on briefs), for appellant.

*Todd M. Fiorella (Paul D. Fraim; Jason E. Dodd; Heilig, McKenry, Fraim & Lollar,* on brief), for appellees.

JUSTICE KEENAN delivered the opinion of the Court.

In this wrongful death action, Barbara J. Mann, Administratrix of the Estate of Alvin W. Mann (the plaintiff), recovered a jury verdict in the amount of $392,000 plus funeral expenses against the defendants Thomas A. Hinton and Hinton's employer, Precision Machine and Fabrication Corporation (Precision). On motion of the defendants, the trial court set the verdict aside, finding that it was contrary to the law and the evidence, and entered judgment in the defendants' favor. We awarded the plaintiff an appeal.

Our standard of review is well settled that, when a trial court sets aside a jury verdict,

the verdict is not entitled to the same weight as one approved by the court. Nevertheless, we must give the party who received the favorable verdict "the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom." Moreover, if any credible evidence supports the verdict, we must reinstate the verdict and enter judgment thereon.

*Fobbs v. Webb Bldg. Ltd. Partnership*, 232 Va. 227, 230, 349 S.E.2d 355, 357 (1986) (citations omitted).

This action was initiated in the trial court on September 11, 1992, by the filing of a motion for judgment in which the plaintiff alleged that her husband, Mann, had died from injuries sustained as a result of Hinton's negligence. The motion for judgment alleged that Hinton, while driving Precision's truck, had failed to exercise due caution when he overtook Mann, who was riding a bicycle, and that Hinton negligently operated the truck so that it "struck . . . and/or came too close to [Mann] so as to interfere with, and/or impede the safe travel and operation by [Mann] of his bicycle." The motion for judgment also alleged that, in addition to the plaintiff herself, the statutory beneficiaries surviving Mann were Mann's father and his two stepchildren.

The evidence at trial showed that Mann, 42 years of age, died on November 2, 1990, of a high cervical spine fracture and closed head injury. On the morning of that day, in clear and fair weather, Mann was riding a bicycle in one of two southbound lanes of Campostella Road in the City of Norfolk. Hinton, driving Precision's truck, was proceeding in the same direction as Mann on Campostella Road.

Melvina Haynes testified that she was driving north on Campostella Road at the time of the accident. Haynes stated that her attention was drawn to the approaching traffic when she saw "debris falling off the back of a truck." From her point of view she could see "[u]p under the truck," and she saw "what looked like a bicycle with somebody's legs; just the lower part of the body." "After the truck proceeded by, I noticed that it was a person on a bicycle. I thought it was a truck, but it was like pinned against like a telegram pole, and as he was leaving the telegram pole, he fell over into the street."

Haynes was asked in what lane the truck was traveling at the time she saw the debris falling. She said, "It was more closer to

the curb lane. It was like it had swerved out a little into the next lane trying to—like it was trying to avoid it." "[I]t was more closer to the curb lane, but kind of interacted with the next lane."

On cross-examination, defense counsel asked Hayes questions regarding whether she had ever seen "the bike or the man come in contact with the truck." Haynes responded, "I never saw them come in contact. When I saw them they were already in contact." Haynes also stated, "When I saw them they were already impacted."

Officer David A. Newman, a homicide investigator for the Norfolk Police Department, testified that when he arrived at the accident scene, Mann's body was lying next to the curb in the right-hand or curbside lane of southbound Campostella Road. Mann's bicycle was nearby, with damage only to its handlebars, which "had been crushed and smashed together." Mann appeared to have a head injury, but he had no injuries below his neck. No part of his body appeared to have been run over by the tires of the truck.

Hinton gave a statement to police investigators in which he said he was driving Precision's flatbed truck south on Campostella Road when he stopped for a traffic light. Mann pulled up next to him on a bicycle and also stopped. When the light turned green, Mann "went ahead," and Hinton's truck then began to pass the bicycle at no more than 10 miles per hour. Hinton said that, in passing the bicycle, his truck was three or four feet from the curb.

Hinton also stated to police investigators that, when "about half of the bed of the truck" had passed Mann, Hinton "felt a bump" in the "back right rear" of the truck, and "heard a noise." He stated he was sure that the front of the truck did not hit Mann, and that he did not know "what part of [the] truck hit the man."

Several witnesses testified that they were unable to find any physical evidence on Hinton's truck indicating that the truck had made contact with the bicycle or Mann's body or clothing. Officer Newman stated that he had examined Hinton's truck and found no marks on the truck's front bumper. Newman stated, however, that he noted a defect in the railings that enclose the flat bed of the truck. On "the right-hand side of the truck along the bed there were railings which supported whatever load he was carrying. The right-hand rear end of the truck was hanging off on the right to a degree. It wasn't perfectly in line with the other rails." Two photographs received into evidence depict a section of the

right side railing, which was unattached and was dangling off the right side of the truck bed near the rear end of the truck.

Officer R.L. Burnette testified that he examined the truck "from the front to the rear, the top to bottom," "every inch of that truck that I could touch," including its underside, "with the intentions of finding something under there that would tell me that the truck touched, made contact, ran over that bicycle." However, he could find no such evidence. He stated, "The only way I know there was an accident is the way you see that bicycle right now."

Stephen B. Chewning gave expert testimony on the plaintiff's behalf as an accident reconstructionist. Chewning had visited the accident scene, examined Mann's bicycle, and taken measurements from an exemplar (undamaged) bicycle. He further had examined an exemplar truck and talked to the Ford factory to obtain the specifications of the Precision truck.

Chewning testified that the curbside lane of Campostella Road was 120 inches wide. The front of the exemplar Ford truck body was 96 inches wide, although "the bed can be a little wider than that." The width of the exemplar bicycle was 24 inches at its widest point, which was the outside span of the handlebars. Thus, the combined widths of the truck body and the bicycle were exactly equal to the width of the curbside lane.

Barbara Mann testified that, when she and Mann were married in 1977, she was a single mother and had two children, Contrena and Steven Jones. Mann had no children surviving him.

At the time of Mann's death Contrena Jones lived at home, and at the time of trial she continued to live at home with her mother. Steven Jones, who was 22 at the time of trial, testified that he was living with his mother and Mann in November 1990. However, other testimony suggested that he was frequently away from home, staying overnight with friends. Barbara Mann was asked, "Now, your son, Steven, was not living with you at the time, was he?" She answered, "Not permanent." Instead, Steven was living "back and forth."

Steven testified that he customarily stayed with friends, including Verdie Roundtree, "maybe a day or two . . . if I have a job to get to and it's closer from their house to the job." His prior testimony included statements that he had been "in and out" between his mother's house and Verdie Roundtree's house around the time of Mann's death. When he was asked, "And your mother, your

testimony is you were living with her at what address?" Steven replied, "I can't—I don't remember the address."

Barbara Mann stated that "Steven went to Job Corps, and . . . he would need money for personal items and things like that, and my husband would send him money" from time to time. Both Steven and Contrena testified that Mann sometimes gave them money to spend. The jury also heard testimony from Mann's father, Arthur E. Mann, 70 years of age, regarding his relationship with his son. The plaintiff then rested her case, and the trial court denied the defendants' motion to strike the evidence.

The defendants called as an expert witness Leah Linda Elizabeth Bush, M.D., an assistant chief medical examiner for the Commonwealth, who examined Mann's body about four to five hours after the accident. She testified that she found no contusions, abrasions, or lacerations below the neck, and that she did not observe any tire marks or any "road burn," which would indicate that Mann's body was dragged along the pavement or that it sustained any injuries caused by crushing.

Hinton testified that on the day in question, he was assisting in Precision's move to a new shop by transporting some of the company's office equipment. Hinton had secured the equipment, including "[f]ile cabinets" and "office supplies," on the back of the flatbed truck. After driving away the loaded truck, he stopped for a traffic light on Campostella Road.

Hinton stated that, as he was waiting at the light in the curb-side lane, another vehicle stopped next to him in the left-hand lane. Mann approached on his bicycle and pulled up along the passenger side of Hinton's truck. When the light turned green, both Mann and the vehicle in the left-hand lane pulled ahead of Hinton. Hinton drove forward slowly, in low gear, and began to overtake Mann's bicycle. By this time, Hinton said, "the car beside me was gone," and as he approached the bicycle, he moved to the left, giving himself "plenty of room" to pass.

Hinton also testified that he glanced several times at Mann as he passed him, using the passenger-side rearview mirror. After the cab of his truck had passed Mann, Hinton looked again in the mirror and saw "he had plenty of room." He said Mann appeared to have control over his bicycle and was not riding in any unusual manner.

Hinton continued, "Then I felt a bump." The truck "just jumped." "After it did that, I looked in my passenger side mirror

and I saw papers in there." He stopped the truck, got out to investigate, and then saw Mann lying in the street.

Hinton testified that he was unable to say how far his truck was from the bicycle when he passed it, or how close his truck came to the rear of the bicycle before he moved the truck to the left. A diagram that Hinton had drawn depicted the position of the truck's left front tire at the time the truck passed Mann. The diagram shows about half the tire positioned over the broken white line that divides the roadway into two lanes, and about half the tire on the far (left) side of the white line. When he was asked to "put an 'X' in the lane that [his] truck would have been in," Hinton put a mark in the curb lane. Hinton denied that the front or side of the truck ever came in contact with the bicycle.

After the defendants rested their case, the trial court denied the defendants' motion to strike the evidence and submitted the case to the jury. Their verdict specified that 85% of the $392,000 award was to be distributed to Barbara J. Mann, and that 5% was to be distributed to each of three other beneficiaries, Arthur E. Mann, Steven Jones, and Contrena Jones.

On appeal, the plaintiff argues that the trial court erred in setting aside the jury's verdict, because the verdict was supported by credible evidence. In response, the defendants contend that the plaintiff failed to present a prima facie case of negligence. We disagree with the defendants.

■ As the trial court instructed the jury, Hinton had a duty, in passing Mann's bicycle, to proceed at a safe distance and at a reasonable speed. *See* Code § 46.2-839. As stated above, Chewning's testimony showed that the curbside lane was only wide enough to accommodate the width of the bicycle handlebars and the 96-inch width of the truck body, which did not include the extra width of the truck that may have resulted from the loose bed railing. Further, the jury was entitled to find credible Melvina Haynes's observation that the truck was "already in contact" with Mann or the bicycle at the time her attention was drawn to the truck.

■ Testimony by both Haynes and Hinton showed that Mann was found lying in the street immediately after Hinton's truck had passed him. In addition, Hinton's statement that he "felt a bump" and heard "a noise" just after he had lost sight of Mann was circumstantial evidence that a collision occurred between the truck and the bicycle. The jury viewed the bicycle and its crushed han-

dlebars, and they reasonably could have inferred that this damage occurred when the truck tires ran over the handlebars, causing the "bump" and "noise."

■ In addition, there was no evidence that, during the short time the truck and the bicycle were in proximity, any other factor caused Mann's sudden head and neck injuries or the damage to his bicycle, such as defects in the roadway, the negligent or intentional act of a third person, or Mann's own negligence. Thus, we conclude that the above facts constitute credible evidence permitting a rational conclusion that Mann's injury and death were the proximate result of Hinton's driving and passing too closely to Mann.

■ The defendants have assigned cross-error, arguing first that the trial court erred in denying their motion to require the plaintiff to elect one theory of recovery. The defendants contend that the plaintiff failed to present a single explanation of how the accident occurred, but instead advanced two arguments, that Hinton's truck passed too closely to Mann although without touching him, and that the front bumper of Hinton's truck struck Mann and threw him from the bicycle. The defendants argue that these theories are mutually inconsistent and contradictory, and that they invited the jury to indulge in speculation. We disagree.

The plaintiff did not assert factual theories that were inconsistent or mutually contradictory. She argued that Hinton's negligence consisted either in passing so closely to Mann that he caused Mann to fall from his bicycle, or in passing so closely to Mann that his truck actually struck him. These theories are essentially the same, differing only in a matter of degree. Both theories rest on the same premise that Hinton breached his duty to pass at a safe distance when approaching a bicyclist, and that this breach proximately caused the decedent's death.

The defendants also contend on cross-error that the trial court erred in ruling that the 1992 version of Code § 8.01-53 controlled the determination of which persons were Mann's statutory beneficiaries. The defendants assert that the trial court was required to apply the version of Code § 8.01-53 that was in effect on the date of Mann's death, which would have permitted only Mann's spouse and parent, and not his stepchildren, to share in the damages awarded.

The defendants further assert that in applying the 1992 amendment, the trial court affected rights that had accrued before the

new law took effect, contrary to Code § 1-16.[1] The defendants argue that the rights of the beneficiaries eligible under the former statute are affected by the 1992 amendment, because they will now share the distribution with a larger class, and further that the defendants' substantive rights may be affected because "a larger class of beneficiaries may yield a larger award." We disagree with the defendants.

As the defendants point out, the 1992 amendment to Code § 8.01-53 added to the classes of persons who may be considered the beneficiaries of a decedent under the wrongful death statutes. Under the 1992 amendment, Code § 8.01-53(A) provides, in material part, that

> . . . (iv) if there are survivors under . . . clause (iii), the award shall be distributed to those beneficiaries and to any other relative who is primarily dependent on the decedent for support or services and is also a member of the same household as the decedent. . . . For purposes of this section, a relative is any person related to the decedent by blood, marriage, or adoption and also includes a stepchild of the decedent.

However, both before and after the 1992 amendment, the following language appears in Code § 8.01-53(B): "The class and beneficiaries thereof eligible to receive such distribution shall be fixed (i) at the time the verdict is entered if the jury makes the specification, or (ii) at the time the judgment is rendered if the court specifies the distribution." We hold that this language means that any person included among the pertinent categories of beneficiaries specified in Code § 8.01-53(A) at the time the jury's verdict is entered is a beneficiary eligible to receive a distribution. *See Knodel v. Dickerman*, 246 Va. 124, 127, 431 S.E.2d 323, 325 (1993). Thus, under either version of Code § 8.01-53, the class of Mann's beneficiaries was not fixed as of the date of his death, and the defendants had no rights that accrued under the earlier defini-

---

[1] Code § 1-16 provides in material part:

No new law shall be construed to repeal a former law, as to . . . any right accrued . . . under the former law, or in any way whatever to affect . . . any right accrued . . . before the new law takes effect; save only that the proceedings thereafter had shall conform, so far as practicable, to the laws in force at the time of such proceedings . . . .

tion of categories of beneficiaries. *See Knodel*, 246 Va. at 127-28, 431 S.E.2d at 325-26.

■ In their next assignment of cross-error, the defendants argue that the trial court should have held as a matter of law that Steven was not Mann's dependent.[2] We disagree with this contention.

Only when the facts and circumstances are such that reasonable persons could not differ should the trial court decide as a matter of law whether a decedent's relative is a "dependent" or "member of the same household." *See Allstate Ins. Co. v. Patterson*, 231 Va. 358, 363, 344 S.E.2d 890, 893 (1986). Here, there was sufficient evidence for the jury to decide that Steven met the statutory requirements of Code § 8.01-53(A), given the evidence of both the financial support that he received from Mann and the amount of time that he lived at home with his mother and Mann.

Based on our conclusion that the trial court erred in setting aside the jury's verdict, but that it did not err in its rulings challenged by the defendants in their assignments of cross-error, we will reinstate the jury's verdict and enter final judgment for the plaintiff.[3]

> *Affirmed in part,*
> *reversed in part,*
> *and final judgment.*

---

[2] On brief, the defendants also argue that the trial court should have required the jury to make specific findings of fact, including the exact length of time that Steven and Contrena Jones lived at any residence, and other specific elements that would establish the fact of dependency. However, we do not consider this argument because the defendants did not raise this issue in the trial court. Rule 5:25.

[3] At oral argument before this Court, the plaintiff waived her remaining assignment of error, relating to the trial court's exclusion of expert testimony to establish the quantum of damages; therefore, there is no issue requiring us to remand this matter to the trial court.